United States with Relator Maria del Carmen Gamboa Ferguson v. Lockheed, and we'll hear first from Mr. Shackelford. Good morning, Your Honor, and may it please the Court, Stephen Shackelford for the Relator and Appellant Carmen Ferguson. The defendant, Lockheed Martin, is the largest defense contractor in the world. They have various programs with the United States that are worth any given year tens of billions of dollars. They obviously serve a very important role in our national defense, but as President Lincoln recognized back in 1863, defense contractors like other government procurement companies can sometimes fall prey to defrauding the federal government, and that is why we have a False Claims Act that allows for key TAM relators to seek out fraud, to reveal disclosed fraud that is being committed against the government and to help the government recover monies that it has been defrauded out of. Didn't one of my colleagues opine the possibility that the key TAM law is unconstitutional? One of your colleagues did, Your Honor. We obviously strongly disagree, and I believe binding Fifth Circuit precedent has held it to be constitutional at this point. So, Your Honor, the key TAM Act anticipates that you will have relators who will come first, file under seal, whistleblowers effectively, who will bring to light to the government various different frauds being committed against the government. Lockheed is such a large defense contractor that even a single one of its programs, like the F-35 program, costs the government legitimately billions of dollars potentially every year with different contracts entered into every year or two potentially. You can imagine that there can be all manner of fraud conducted by all manner of different people within Lockheed that one relator may know about and other relators will have no idea about. And now, you're just . . . your firm is just here as appellate counsel, or you are co-plaintiff counsel now? Your Honor, we were trial counsel for Ms. Ferguson in the trial court. We were not original trial counsel. We joined the case when it was still under seal in the Eastern District and we stayed with the case when it was transferred to the Northern District. What about Mr. Boyd? Mr. Boyd is right here at the table with me, Your Honor. But he was the Girard case, right? Yes, Your Honor. We were not counsel in the Girard case. Mr. Boyd was counsel in the Girard case. I see. So we have two different whistleblowers here, Mr. Girard and Ms. Ferguson, doing exactly what the False Claims Act was enacted to have them do. They're blowing the whistle on frauds. In the case of Mr. Girard, that cost the federal government tens of millions of dollars. In the case of Ms. Ferguson, that have cost the federal government hundreds of millions and potentially billions of dollars. The issue, of course, before the Court is whether or not Mr. Girard's lawsuit, which counts as the first to file for purposes of this litigation, bars my client's key tam lawsuit. And of course, we start with the statute. The False Claims Act provides that when a person brings an action under the key tam subsection, no person other than the government may intervene or bring a related action based on the facts underlying the pending action. So the statute focuses on the facts underlying the first filed action. Of course, as the Court knows, courts have had to interpret that phrase, and most courts, including the Fifth Circuit, have settled on some form of the essential elements or material facts test, which holds that the two lawsuits and the claims in them don't have to be identical in order for the first to file bar to apply, but the second filed lawsuit has to share the same core material facts, sometimes phrased as essential elements or essential facts, as the first filed lawsuit in order for the first to file bar to apply. One other very important element of this analysis is that it is a claim-by-claim analysis. So unlike with the public disclosure bar, where if you base even part of your lawsuit on a public disclosure and you're not an original source, you can be kicked out of court. With the first to file rule, courts will analyze, as you've seen in a lot of the case law cited by both parties here, they'll analyze each different claim, and that can be what is styled as a single claim can actually be multiple claims if it's addressing different forms of fraud committed on the government, and a relator can find that one of their claims or . . . I think claim-by-claim is almost as hard to categorize as essential facts. Well, I'll try to help, Your Honor, with as best I can. In both of them, as you see in all the case law, and I will go through it if Your Honors will let me, each case, whether it goes in favor of the second file or against the second file, they're looking at the scheme, the fraudulent schemes in the two different complaints, the facts of the scheme. They're not looking at was a false claim made to the government because that's . . . you have to have a false claim made to the government. You have to potentially have a false certification or a lie to the government in order to bring an FCA case. So that's too high a level of generality. Mr. Shackelford, as I understand the issue here in the Girard case, it concerned the scheme of what I would summarize as purchasing at bulk and billing at retail. Would that then, would the Girard case capture that type of scheme as to the F-16 program or the C-130 program, the same scheme but applied to other defense contracts? It's a fair question. I think it would depend on the specific facts of the case. It's not this case. Ms. Ferguson has not alleged any sorts of bulk buy with a discount but then charge retail to the government. That is not any of her many different schemes that she unearths with different subcontractors. It had nothing to do with that. But in terms of whether Mr. Girard's, what he came forward with, with a bulk buying scheme specific to the F-35, to three specific contracts, I could see circumstances where the facts he made aware to the government indicated that this scheme of bulk buying and not passing along discounts to the government was not limited to the F-35, and I could see circumstances where it seemed to be completely limited to the F-35 and it would have taken a new whistleblower. Well, let's not just speculate. Let's compare the, the way to determine this is by comparing the complaints, is it not? Yes, Your Honor. All right. And I'm looking at the Girard complaint, and it doesn't talk about bulk purchasing blah, blah. It says uninflated cost information as associated with Lockheed in negotiating prices for the F-35, and likely other programs company-wide by falsely inflated the Aero F-35, and likely other program costs company-wide. And then on page two, likely other program costs company-wide, likely other program proposals, likely other program cost inputs. In other words, just in the first two pages of this, it's no less than about eight times the Girard complaint talks about likely other program and cost pricing. Moreover, they all, you know, both of them revolve around the FAR, FAR regulations and the TINA regulations, right? They do, although different regulations within the— And quite a bit. And hundreds of millions of dollars in Ms. Ferguson's complaint deals specifically with the F-35, hundreds of millions of her complaint. That is true, Your Honor. But in answer to Your Honor's earlier statement, while Mr. Girard did allege in general terms that there was some passing on of—that the charges to the government were inflated for the F-35 program and likely for other programs, he specified in numerous paragraphs that we cite in our briefing exactly what he was talking about when he said it was inflated. He talks about the bulk buying scheme, for instance. Well, does that narrow his complaint? Or does—I mean, he's—in other words, the, you know, essential facts inquiry, and I'd like to know what your best case is about that's similar to this one, but the government is no idiot about—they try to control costs in these programs, and the regulations go minute by minute detail, and he says this regulation is violated, that regulation is violated, and the, you know, documents could fill warehouses about what all this involves. So why is it not reasonable to say that when he was filing suit on the F-35, that was the one he was just nailing it down, but you could use the same approach and reasoning to any of the other aircraft projects? Your Honor, it is certainly possible the government could have used the same reasoning with respect to the bulk buying discount—failure to pass along discount scheme that Mr. Girard alleged. The only specific factual allegations in his complaint, for instance, paragraphs 21 and 22, are about his continued observation that Lockheed would buy low and sell high to the  Specifically, they would obtain these lot discounts by buying in advance, but they would fail to tell the government that they were paying a lower price than they were charging the government for those specific costs. So it is certainly possible that the government could have investigated whether the people responsible for the— But that's exactly the same thing, isn't it, as violation of TINA and FAR that Ms. Ferguson complains about? It is completely different, Your Honor. It's the same statutes. It's not completely different because it subsumes, it necessarily subsumes what Girard was talking about, and you can argue it's not about—but it's not confined to the—whether or not it's confined to the F-35, but it's still the same ball of wax. Your Honor, respectfully, the reason why that wouldn't work in any of the other cases that both parties cite—let's take, for instance, the branch consultant's case. That was a case about— Branch? The branch consultant's case. By this court? By this court, yes, Your Honor. That's why I say that doesn't prove a whole lot. That's Allstate on the one hand and, you know, some other insurance company on the other hand. So that was an easy call on the facts of it. But Your Honor, all that that court held was that with respect to the specific fraud of changing wind damage over to be categorized as flood damage, that was what the scheme was and that was what the second— And they said it was sufficient if you said they did it in Mississippi to cover also they did it in Louisiana. But they said you can't transport, you know, just alleging that one insurance company did it to another insurance company. I agree, Your Honor. But so that's a geographic or different companies. But if you also look at the scheme, there is nothing in branch consultants that indicates that after this scheme of falsely classifying wind damage as flood damage, that nobody else could bring a ketam case if they had uncovered, for instance, that State Farm's—that those for insurance payments were false in some completely different way. Let's say that they made people up. You're trying to extrapolate something that's not in the case. So what's a better case? Well, let's take, for instance, the— Do you have any seriatim major defense contractor cases? I mean, obviously, you know, so the next person's going to—these are both the same time frame, you know, back in the early 2010s, same regulations. Your Honor, we have—one of the favorite cases of Lockheed is the Carson versus Manor Care case. They talk about it quite a bit. That's a case where two different relators brought claims of medical overbilling by the  But if the court were going to apply simply this idea, well, they both pointed to medical overbilling, which violates the same statute, the Medicare statute. That would have been the end of the analysis. But the court in Manor Care spent two pages, pages 303 to 304 of that opinion, going through the similarities between the specific scheme there. So it wasn't enough that Relator 1 says Manor Care is filing fraudulent Medicaid reimbursements because they're lying about something on there. The court said that in order to properly analyze first to file, you have to look at the facts alleged by the first, exactly what the scheme was, and the scheme alleged by the second. Now the schemes don't have to be identical, but there has to be significant overlap. And another good example of the overlap issue is the Batista case, which is also another favorite of Lockheed Morton. There, both Relators, again, the false claims were certifications made to the federal government that the lenders were operating according to all applicable federal laws. The Girard complaint here, it's not limited, even if we limit the complaint in Girard to the bulk billing versus retail billing. Once the government began to investigate, aren't we also allowed to analyze what would a reasonable investigation have uncovered, and wouldn't that have captured, at least as to the F-35 program, the allegations within Ms. Ferguson's complaint? It's a hypothetical that I think you'd have to answer no if you asked it, Your Honor, because Ms. Ferguson only uncovered her frauds because she was an auditor who was looking at a completely different part of the program. She was looking at how certain subcontractors, not named whatsoever in the Girard case, how they were accounting for their labor hours that they were billing all the way through the federal government. And she found, time after time, that Lockheed knowingly certified false labor hours, for all sorts of reasons, of different subcontractors. Now, Lockheed didn't pocket a difference there. It was a completely different sort of fraud. Lockheed just passed along these false labor hours, which were— No, but the whole point is, whether you call them false labor or bulk buying, the violation is TINA and FAR. Well, Your Honor, the same thing is true, for instance, of the Planned Parenthood case. In the Planned Parenthood case, the court could have just said, well, these are both allegations that this was improper Medicaid billing. But the court went further than just saying it's improper Medicaid billing. That would be the equivalent of saying improper TINA certifications. The court said, how is this improper Medicaid billing? Is it the same sort of improper Medicaid billing being alleged by the first versus the second relator? And the court conducted that analysis and found that both of them, both relators, had alleged the same sorts of fraud, which was altering of patient records so they were billing for services that were not rendered. There are a bunch of ways to file false Medicaid claims. You can also bill for the wrong service. You can also bill for patients who you didn't even see. There are all sorts of different frauds you can commit. But it wasn't enough that they invoked the same statute as being violated. Just as here, it's not enough that both relators invoke TINA as being violated. And I don't know if my time is up, Your Honor, but just to answer Judge Rodriguez's question, in point of fact, that investigation went on for three years until Ms. Ferguson's case was transferred to the Eastern District. They had not done any of the work on Ms. Ferguson's case. It was only when Ms. Ferguson, as she put in her motion for reconsideration of random assignment, it was only when she went, when her case went to the Eastern District, the U.S. Attorney's Office began to look into the specific types of violations she had alleged in a completely different office, with completely different people, with a completely different mechanism of fraud. And when you get up on rebuttal, I'd like you to talk about her references to related cases, referring also to Gerard. Could I answer that? Yes, Your Honor. Sure. I just want to know how, with regard to the Ferguson allegations, how that benefited Lockheed Martin. Assuming what she said is, what she alleges is true, how does that benefit Lockheed Martin? The most basic way it benefits Lockheed Martin, and we plead this in our complaint, the way that these giant contracts are priced out is Lockheed has to work with each of the subcontractors, get their pricing, Lockheed is supposed to certify that it's complete, accurate, and current, and then Lockheed puts all those pricings together, puts on top of it a set amount of profit percentage, and that's the bill the government ultimately pays. And so it benefits Lockheed, certainly their profit percentage will be higher in these giant fixed price contracts, but even if it didn't benefit Lockheed, Your Honor, it's, Ms. Ferguson alleges in detail how she knows that there were people at Lockheed who knew that pricing was false and inflated, and who passed it along to the government anyway, so you know the fraud occurred, whatever the motive for it was. And don't they have a contractual obligation to try to ensure that what they're paying for products and labor is reasonable? Because ultimately it's us who pay for it, right? Lockheed passes all those through, they do, and that's what Ms. Ferguson's job was, and the more she found out, the madder Lockheed got, and that's why she was ultimately let  All right. Thank you. Okay, Mr. Hagan. Good morning. May it please the court, I'm Patrick Hagan, counsel for Lockheed Martin. I want to start with what makes this case unique. No other relator has voluntarily dismissed a pending action, refiled it in a new district, and then argued that refiled case is substantially related to an already pending case. But that's what Ferguson did here. The only distinction she offered is that the details of Lockheed Martin's alleged failures differed between the two cases. And where, in what document did she talk about that? That's in her motion for reassignment, which begins in the record at page 1164. I didn't know you could reassign cases like that. I did not either, Your Honor. So it's an Eastern District thing. It's an Eastern District. She filed the motion in the Eastern District. She also said in that motion the government pursued a common investigative focus into company-wide derelictions of the False Claims Act and TINA. That's what this court's material elements or essential facts test requires. She has the burden to establish jurisdiction, but those three admissions, substantially related, common investigative focus, details differ, help to negate jurisdiction. That's because they track the three critical and controlling principles in the branch consultant's decision. In branch, first, this court rejected any construction that focused on the details of the later filed action because that approach could not be reconciled with the first-to-file bar's goals. But the details are where she's consistently focused. That's the word she used to distinguish her case from Gerard's. In her brief at page 22, she argues the district court erred because it failed to look to the detailed factual allegations underlying each relator's claims. But branch said that's not the focus. The court explained where the focus should be on whether investigation into the first lawsuit would uncover the activity alleged in the second. That's why her reference to a common investigative focus into TINA and FCA violations is so significant. The material elements are identical in both cases. Both relators allege fraudulent inducement of multiple aircraft contracts. The same wrongdoing. Both allege Lockheed Martin's TINA violations, concealed inflated subcontracts. And I guess, counsel, I hear that argument, but your argument seems to be that you don't look at the details, but then you have to make some determination about similarity, and I don't know how you make some determination about similarity and overlap in the claims without looking at the facts surrounding the claim. You're saying that gets you to whether or not this investigation would uncover this scheme. And I don't know how you do that without looking at what the scheme is, and that seems to be what you're saying. How do you do that? That's not what I'm saying. So start with the material elements. To understand if a fact is important, you have to know what each relator is alleging. And here they're alleging the same thing. They're alleging fraudulent inducement based on TINA. And then you look at the facts the government would investigate to pursue the theories alleged. Here we have overlapping contracts. So are you saying the facts the government would investigate don't include the details of the scheme? I would say the focus is on what fraud each relator alleges and not the details of the ways in which the scheme could be executed. So that's the distinction I think this court drew in Planned Parenthood when it characterized the fraud as fraudulent billing for medical services. And it noted distinctions in alleged method of execution. So the second relator said they have an upcoding problem, but the court said that's not a material distinction because the government would investigate it by looking at medical records and determining whether the billings were true or false. The same is true here. Mr. Haney, what is the limiting factor when you're comparing the two complaints? Where do you draw the line based on the Girard lawsuit? Would it then encompass any violation of TINA as to any defense contract by Lockheed? That's not our argument. We focus in particular on the overlapping contracts. So both relators point to F-35, LRIP-7, and later. Mr. Girard alleges a continuing fraud. Both relators point to those contracts specifically. Both relators said their fraud can be uncovered by looking at Lockheed Martin's proposals. That's the alleged false state of facts. That's what's in the certified cost or pricing data that went over to the government in connection with the proposal. They both point to the same TINA certification that Lockheed Martin provided on those contracts. That's the false statement. And then the government's investigative question is, are there any other facts as of the date of price agreement that would suggest a lower price that were not disclosed? And do you go beyond the F-35 program? So there are a couple ways to get beyond the F-35 program. In branch, this court emphasized that the reason it did not apply the bar to the unnamed defendants was the independence and lack of coordination. They were separate companies doing their own thing. Here, Lockheed Martin is Lockheed Martin. Lockheed Martin is responsible for four aircraft programs. The Department of Defense is well aware of that. It's also in Lockheed Martin's SEC filings, which Ms. Ferguson cites in her brief. In addition, Gerard doesn't point the government to any particular contractors. He says broad, general fraud, not tied to any particular program. So to investigate, the government's going to have to look at a cross-section of subcontractors to figure out if his fraud is accurate or not. Ferguson says the same thing. Although she identifies six specific subcontractors, in paragraphs 26 and 32 of her complaint, she says, I looked at over 100 subcontract procurement files, and I found the same problem in almost all of them. It was a systemic fraud at the Lockheed Martin level that didn't turn on the particular subcontractor, the particular contract, or the particular program. It is a broad, general fraud, and it overlaps with Gerard's allegations. Even if you want to look at her specific subcontractors, four of the six, Kirkhill, KDA, Elbit, and KAI, worked on those overlapping contracts, LRIPS 7 through 9. Kirkhill also worked on the F-22 program. KAI also worked on the F-16 and C-130 programs. And again, Judge Jones, you asked about going claim by claim. Ms. Ferguson alleges one claim. There is one fraud at the Lockheed Martin level that is consistent across programs and subcontractors. So am I correct that based on... that the DOJ has looked at all of these and elected not to intervene, is that right? That's correct.  So this case has been around... Did we take anything out of that? Can we infer anything out of that or not? I think you can here, based on the specific facts. This case has been around for nine years in one form or another. They declined three times in the Northern District. A different team declined for a fourth time in the Eastern District. And then they settled the Girard case knowing that this case had been dismissed. It was settled after the parties completed briefing. So there is no harm to the government. The government has had almost a decade to look at these allegations. Two different teams have investigated them, and its behavior has been consistent. It is not interested in pursuing these allegations. So if the government fails to intervene, does that mean the government forfeits any right to recovery? No, it does not. The government can intervene later, and it will share in any recovery. How does an investigation into Lockheed and the alleged scheme in Girard, looking at purchasing in bulk, billing at retail, reasonably and naturally lead to an investigation about subcontractors overbilling their labor costs? So I want to address the bulk billing piece because I don't think Ms. Ferguson's characterization of that is quite accurate in the context of the material elements at issue. There are certainly allegations in Mr. Girard's complaint that suggest he's talking about billing after contract award, so billing during performance. But that cannot be a TINA violation. U.S. XRL Sanders v. Allison Engine, the district court's decision, addresses this point and has a nice summary of the relevant TINA issues. So TINA is a disclosure statute. It requires disclosure during negotiations with the government. Those obligations terminate when the parties reach price agreement. Anything that happens after the price is agreed upon is not relevant to a TINA analysis. That would include bills during performance on that particular contract. In the Sanders case, the relator specifically argued that the defendant there had an obligation to disclose to the government that it had, after price agreement, gone and negotiated a better deal with the subcontractor. And the court said, no, that's not an issue under TINA. That's not a TINA violation. Mr. Girard does have factual allegations that support a TINA theory. So in paragraphs 16 and 22, he talks about a Lockheed Martin plan to save by ordering an increased volume of parts. That was the central issue in the Allison Engine case. When does something become concrete enough to be a plan versus hopes which are not factual under TINA? He also alleges in paragraph 33 that Lockheed Martin omitted the parts acquisition purchase history. So in the scheme he alleges, let's assume Lockheed Martin negotiated a bulk buy after price agreement on LRIP 7, that pricing would need to be disclosed under TINA during LRIP 8 negotiations, assuming they happen after that buy. And so the failure to disclose that you had previously gone out and negotiated a better deal could support a TINA claim. What the government's going to do to investigate Girard, the two critical points are what Lockheed Martin proposed and the price Lockheed Martin negotiated. That's at the heart of his fraud. We don't think, under branch, you need to go to this level of detail, but even the details here show the clear connection between Girard and Ferguson. So Ferguson says, repeatedly, in her brief and in her complaint, the two documents she focuses on are PCAMs, price-cost analysis memos, and PNMs, price negotiation memos. The PCAM, she says on page 6 of her brief, is what Lockheed Martin uses to analyze the subcontractor's proposal. That's where Lockheed Martin looks at the cost and pricing data, recommends a reasonable price for the negotiations with the government. The PNM is where Lockheed Martin documents the negotiated price with the government. She says, in paragraphs 26 and 32 of her complaint, this is where she went to figure out the fraud. She looked specifically at those documents, and they lacked the documentary indicia to support that Lockheed Martin was requiring its subcontractors to submit the data they were supposed to submit. So if you're investigating Girard and you want to know what Lockheed Martin proposed, the PCAM's a great source of that information. What I don't understand is... ..how you could comply with TINA and not put that information in. You see what I'm saying? So didn't the government have the initial responsibility to look at the TINA reports? And if they didn't say what they were supposed to, they wouldn't have negotiated? Am I misconstruing something? I think...I believe, Judge, that gets at our pleading argument. So Ferguson's complaint essentially alleges that Lockheed Martin's analyses were faulty because they didn't require submission of all the cost or pricing data, and the government necessarily relied on those, essentially took Lockheed Martin's analysis at face value without doing its own homework. Our point, from a pleading perspective, is that the FAR regulations say the government can't do that. The contracting officer has an obligation to go look at the subcontractor's cost or pricing data and do an independent analysis. And given the scope of her allegations across multiple programs and multiple contracts, it's not plausible to say that all of the contracting officers were asleep at the wheel. Well, that was sort of what I was getting at. So this paragraph 26 is, in approximately 100 subcontracts, in excess of $1 billion that were reviewed by Ferguson, Lockheed acted in concert with contractors to overcharge by ignoring the requirements to submit subcontractors' certified costs and pricing data? Is that the paragraph you're talking about? Yes, Your Honor. Okay. But it is that certified costs and pricing data that was supposed to be transparently available to the government before they signed the contract, right? Correct. And she says, she alleges, that Lockheed Martin passed on that cost or pricing data. That's not her criticism. Her criticism is that Lockheed Martin, in performing its analysis, should have seen that the data provided wasn't sufficient. We disagree with that, based on the plausibility of her allegations, but that is the allegation. And for the first-to-file point, I think the key point is, this is where I went to look and figure out the fraud. These are the documents that reveal my fraud. And they are central to the Girard analysis. I talked about the PCAM. The other piece of Girard's central theory is, Lockheed Martin negotiated a lower price. The PNM is going to show what price Lockheed Martin negotiated, and it's going to explain why Lockheed Martin believed that was a fair and reasonable price. So, starting with those documents and comparing the reasons, what data did Lockheed Martin rely on to propose a low-quantity, higher price, vice versa, in the PNM, is going to be a great place to start your investigation. And Ferguson says... Again, let me interrupt. I mean, you indicate all TINA violations relate to disclosure, inadequate disclosure. I mean, I'm still having difficulty. Where is the limiting point if they all relate to inadequate disclosures? So, I think you have to look at, you know, where do both relators draw the circles of their fraud? And here, we have broad general schemes. There's nothing in Girard's complaint that says this is unique to F-35 or these particular contracts. He's alleging a broad general fraud, as is Ferguson. Well, what do you do about... Ferguson goes on in these six representative contracts, and I did... Frankly, I didn't realize... I didn't think she was going after 100 different contracts, which is extravagant. But some of these involved... ..false or inflated hourly worker charges in India and South Korea, something like that. Yes. So, that seems to me somewhat separate, perhaps, conceptually, from, you know, various parts or domestically manufactured items or, you know, parts that weren't being ordered. So, I think the critical point... If you had to go over to India to investigate, were the workers being paid, or were there 1,000 workers or 500? So, I think the critical point there, and I'll direct you back to those same two paragraphs, 26 and 32, is that she says the fraud's detectable at the Lockheed Martin level. Each of the subcontract examples she provides, there's some slight variation in what she says they're doing wrong. But she says the fraud is detectable through Lockheed Martin's own documents, by looking at Lockheed Martin's analysis of the cost or pricing data. That's the unifying theory. That's the thing that connects everything together for her. And the government, in investigating Girard's complaint, is going to look at Lockheed Martin's analyses. It's also going to look at the total mix of cost or pricing data that was disclosed, because Tina requires a holistic examination of the data to determine what's there, what's important to the government's negotiation. That's why we point out on pleading that she doesn't address that. She doesn't address that causation piece under the FCA and the reliance and causation elements under Tina. I also want to circle back to my original point about her conduct here. The purpose of the bar is to encourage a race to the courthouse with genuinely valuable information. But everything she's done in this case is inconsistent with that purpose, and we'd ask the court to apply the first file bar. All right. Thank you, sir. Thank you. Mr. Shackelford. Thank you, Your Honor. And before I get to your question, which I have the answer to, I do want to point out that we still haven't heard a limiting principle for this idea that once you've found a single Tina violation of any kind, the government's on notice and no more relators can come forward and get credit for exposing completely unrelated false certifications under Tina. Tina is a one-page certification, and with a program as large as the F-35 or the C-130J or the other programs . . . And how many Pentagon auditors do you have to whom these records are immediately available? But, Your Honor, a Pentagon auditor has no way of knowing about the practice over in India with Teelamal, where people were clocking in and walking across the street to work at a different . . . Does he correctly state that she says she originally detected all of these in there and the fact that they were not making full disclosure of what they were supposed to make disclosure of? Part of her claim is that she realized that they were not sufficiently . . . they were not sufficiently doing the work they were supposed to do on the back end. They weren't getting the material that they needed to confirm that the subcontractor pricing complied with law. They would then turn around and tell the government the subcontractor pricing complies with law, even though they didn't do the work to do it. But part of it is Ms. Ferguson went to India and observed with her eyes this practice of clocking in at the plant that the U.S. taxpayer is paying for and walking right across the street to do a day's work at a completely different plant. And despite her exposing that as just one example of fraud, Lockheed kept approving Teelamal's hourly billings and so forth. So that's just one example why you couldn't just look at the papers that Lockheed turned in. Well, I'm going to go back on the entire F-35 deal. I mean, there's at least three or four hundred million of this billion dollar claim that relates to F-35. Your Honor, we're not looking to go back on the deal. We're looking to save money for the taxpayer. No, don't tell me that. You're looking for treble damages and an immense settlement. But why is it not legitimate at the very minimum to separate the F-35 allegations under the first file bar from all the other aircraft? I would agree, Your Honor, at the very minimum those should be separated. But even the F-35 allegations, Your Honor, are quite very distinct. If a government DOJ lawyer is looking at the Girard allegations, he's comparing the purchase orders Lockheed put out to buy the parts in bulk to the amounts they charge the government for it. That's a simple— But in Planned Parenthood, they did the same kind of exercise. And although you cited it, it said the first file bar applied. Right, Your Honor. And the first file bar applied there not because both relators alleged that they were defrauding Medicaid. It's because both relators alleged the same kind of scheme, which is charging Medicaid for services other than those rendered in specific offices. Same offices, same sources. This does not amount to a Medicaid thing where you have the coding. You know, this is—these are contracts where the contractor, as I understand it, has an obligation under TINA to provide X amount of information before the government even enters into the contract, correct? Accurate, complete, and courteous. Yes. And she's saying they didn't supply it. Well, they supplied information, but the information supplied she found out was not accurate, complete, or current.  She said—she keeps saying they didn't supply—they didn't do it. And then in one—I mean, her allegations are all over the mark, frankly. But in one paragraph, she says, and they said, well, we don't have to do that, or they said we're not capable of doing that. Some parts of her allegations have to do with failing to supply information that she believes should have been supplied. But again, the federal government, looking at a TINA certification, would not know that was missing. I do want to answer . . . When did it take four complaints in nine years to get this far? So the Northern District looked at this case for, I think, about three years. And as Your Honor, I'm sure, knows, this is a massive case. U.S. Attorney's offices sometimes are strapped for resources. When she refiled it in the Eastern District, it was with the permission of the Northern District because you have to get the U.S. Attorney's Office and the DOJ's permission to dismiss a case. So that did turn her into the second file. But importantly, and this goes to Your Honor's question you asked me to address when I stand back up, in the filing that Lockheed points to to say, oh, she admitted these cases are related at 1165 and 66 of the record, she was very specific what she meant by related. She said they will address similar legal issues and discovery disputes, which I can tell you has been a big part of this because a lot of this information is confidential, so we have a lot of discovery issues to work out, which I'm sure Gerard would have, too, if it had proceeded towards trial. In footnote three of that filing, she specifically disclaimed any idea that the facts that she was bringing were based on the facts in Gerard. Why is she moving it to the Eastern District and then say, oh, I want the same judge? Well, she moved it to the Eastern District in the hope that the Eastern District, which has somewhat more of an active, at least at the time, False Claims Act practice, would be able to investigate because some relators, even though it gets you less of a percentage of a relator's share, prefer to litigate cases when you have the government working with you. That did not work out, and it was ultimately transferred back to the Northern District. One last case I would point you to that's good for us, the Conyers case. What? Conyers case we cited at pages 19 to 20 of our reply brief. That case says the facts do matter, Judge Rodriguez, the specific facts matter. There the court found that even though the two relators alleged bribery schemes and kickback schemes in Iraq having to do with truck transportation, they were not, the second one was not affected by the first to file bar because they were completely different factual schemes and different underlying facts. Okay. You didn't answer her question. I did. I just said Conyers. Wow. You didn't say Fifth Circuit. Fifth Circuit in 2024. Thank you, Your Honor, very much. Okay. Thank you. Court is in recess until 9 o'clock tomorrow morning.